# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| DANIEL J. RISKIN, M.D., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2019-0570-KSJM |
| | ) | |
| BRENTON BURNS; MARY BETH JENKINS; | ) | |
| RAYMOND SCOTT; JOHN STEPHEN | ) | |
| WHITEHURST; SCOTT HUEBNER; JOHN | ) | |
| KUZMISHIN; FRED SCHWARZER; CRAIG | ) | |
| GOMULKA; CHARLES TALBOT | ) | |
| HEPPENSTALL, JR.; UNIVERSITY OF | ) | |
| PITTSBURGH MEDICAL CENTER, a | ) | |
| Pennsylvania corporation; UPMC | ) | |
| PRESBYTERIAN SHADYSIDE, a | ) | |
| Pennsylvania corporation; UPMC HEALTH | ) | |
| PLAN, INC., a Pennsylvania corporation; | ) | |
| CHARTER LIFE SCIENCES (OHIO) II, L.P., a | ) | |
| Delaware limited partnership; CHARTER LIFE | ) | |
| SCIENCES II, L.P., a Delaware limited | ) | |
| partnership; CLS PARTNERS II (OHIO), LLC, | ) | |
| a Delaware limited liability company; CLS | ) | |
| PARTNERS II, L.P., a Delaware limited | ) | |
| partnership; CLS MANAGEMENT II, LLC, a | ) | |
| Delaware limited liability company, and | ) | |
| HEALTH FIDELITY, INC., a Delaware | ) | |
| corporation. | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Date Submitted:  September 29, 2020
Date Decided:  December 31, 2020

Richard P. Rollo, Travis S. Hunter, Sarah A. Clark, Robert B. Greco, Angela Lam, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; *Counsel for Plaintiff.*

Brad D. Sorrels, Andrew D. Cordo, Daniyal M. Iqbal, WILSON SONSINI GOODRICH & ROSATI, P.C., Wilmington, Delaware; *Counsel for Defendants Brenton Burns, Mary Beth Jenkins, John Kuzmishin, Charles Talbot Heppenstall, Jr., University of Pittsburgh Medical Center, UPMC Presbyterian Shadyside, and UPMC Health Plan, Inc.*

A. Thompson Bayliss, Adam K. Schulman, ABRAMS & BAYLISS LLP, Wilmington, Delaware; Bruce A. Ericson, Stacie O. Kinser, PILLSBURY WINTHROP SHAW PITTMAN LLP, San Francisco, California; *Co-Counsel for Defendants Raymond Scott, Fred Schwarzer, Charter Life Sciences (Ohio) II, L.P., Charter Life Sciences II, L.P., CLS Partners II (Ohio), LLC, CLS Partners II, L.P., and CLS Management II, LLC.*

David J. Teklits, Alexandra M. Cumings, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; *Counsel for Defendants John Stephen Whitehurst, Scott Huebner, Craig Gomulka, and Health Fidelity, Inc.*


**McCORMICK, V.C.**

The plaintiff founded a healthcare technology company called Health Fidelity, Inc. ("Health Fidelity" or the "Company") in 2011 and served as the chief executive officer and a director until he was removed from both positions in mid-2014. The plaintiff alleges that certain defendants engaged in a creeping control scheme dating back to 2011. Once those defendants obtained voting control over the Company, they used their influence to force the Company to enter into self-dealing transactions with the defendants' affiliates and increased their equity stakes by causing the Company to engage in undervalued financing rounds with them. The complaint asserts seven claims against eighteen defendants for breach of fiduciary duty, aiding and abetting, unjust enrichment, and violations of various provisions of the Delaware General Corporation Law. The defendants have moved to dismiss the complaint, filing six briefs totaling 262 pages and asserting at least 17 legal arguments. In the first cut of what ultimately amounts to a glorified pruning exercise, this decision grants the motions as to Count I and parts of Count II.

## I.    FACTUAL BACKGROUND

The facts are drawn from the Amended Complaint and documents it incorporates by reference.[1]

---

[1] C.A. No. 2019-0570-KSJM, Docket ("Dkt.") 56, Verified Am. Class Action and Derivative Compl. ("Am. Compl."). With the Health Fidelity defendants' opening brief in support of dismissal, Dkt. 62, Health Fidelity, Incorporated, John Stephen Whitehurst, Scott Huebner, and Craig Gomulka's Opening Br. in Supp. of Their Mot. to Dismiss the Verified Am. Compl. ("Health Fidelity Defs.' Opening Br."), the Health Fidelity defendants submitted an affidavit attaching twenty-two documents. *See* Dkt. 62,

## A. The Parties

In 2011, Plaintiff Daniel J. Riskin ("Plaintiff") co-founded Health Fidelity, a Delaware corporation based in California. Health Fidelity works with health system customers and insurers to enable value-based healthcare through its artificial intelligence processing platform. At the Company's inception, Riskin served as CEO and as a member of the board of directors (the "Board"). Riskin initially held approximately 80% of Health Fidelity's outstanding stock. He continues to own a small percentage of the Company's common stock.

The defendants have grouped themselves into three categories: the "Charter Defendants," the "UPMC Defendants," and the "Health Fidelity Defendants."

The Charter Defendants are: Charter Life Sciences (Ohio) II, L.P. and Charter Life Sciences II, L.P. (together, the "Charter Funds"), each of which hold stock in Health Fidelity; the Charter Funds' controller, CLS Management II, LLC ("Charter Management"); the Charter Funds' respective general partners, CLS Partners II (Ohio), LLC and CLS Partners II, L.P. (with the Charter Funds and Charter

---

Transmittal Aff. of Alexandra M. Cumings in Supp. of Health Fidelity, Inc., John Stephen Whitehurst, Scott Huebner, and Craig Gomulka's Opening Br. in Supp. of Their Mot. to Dismiss the Verified Am. Compl. ("Cumings Aff."). This decision cites to some of those exhibits, which are incorporated by referenced in the Amended Complaint.

Management, "Charter"); and two current or former Health Fidelity directors designated by Charter—Fred Schwarzer[2] and Raymond Scott.[3]

The UPMC Defendants are: the University of Pittsburgh Medical Center ("UPMC"),[4] which holds stock in Health Fidelity; two wholly-owned UPMC subsidiaries, UPMC Presbyterian Shadyside ("UPMC Presbyterian") and UPMC Health Plan, Inc. ("UPMC Health Plan," and with UPMC Presbyterian, the "UPMC Affiliates");[5] and four current or former Health Fidelity directors designated by

---

[2] Schwarzer was the Charter designee on the Health Fidelity Board from December 2011 until January 2019 and was one of four managing partners of Charter Management during that time.

[3] Scott initially served as the joint designee of the founders (including Riskin) and Charter on the Health Fidelity Board. Since March 2014, he has served as the Series A Preferred Stock designee selected by UPMC (defined below). Scott was an unpaid consultant for Health Fidelity in its start-up years. He has no employment or financial ties to Charter or UPMC.

[4] The Amended Complaint and Plaintiff's opening brief primarily refer to "UPMC Enterprises" rather than "UPMC." UPMC Enterprises is not alleged to be a standalone corporate entity or named as a party to this action. To avoid confusion, this decision refers to this party as "UPMC," except when referring to job titles of certain individual defendants.

[5] The UPMC entities are wholly-owned subsidiaries of UPMC. Neither of them own stock in Health Fidelity. UPMC Presbyterian is a party to a master services agreement dated on or about September 16, 2014, and a joint development and license agreement first entered into on March 21, 2014.

3

UPMC—Brenton Burns, Mary Jenkins, John Kuzmishin,[6] and Charles Talbot Heppenstall, Jr.[7]

The Health Fidelity Defendants are: Health Fidelity; its CEO, John Stephen Whitehurst;[8] its former CFO, Craig Gomulka;[9] and Board member Scott Huebner.[10]

This decision collectively refers to the Charter Defendants, the UPMC Defendants, and the Health Fidelity Defendants as "Defendants."

---

[6] Burns, Jenkins, and Kuzmishin all served as UPMC designees on the Board at various times, and they were all employed by UPMC when they served on the Board. Burns served on the Board from 2015 until April 2016, and again from October 2016 to the present; he is currently Chairman of the Board. Between terms as a director, Burns is alleged to have attended various Board meetings as a UPMC observer. Jenkins has served on the Board since April 2016. Kuzmishin served on the Board from March 2014 until 2016; he was also Chairman of the Board during that time.

[7] Heppenstall was a UPMC designee on the Health Fidelity Board from 2014 until June 2015. At all relevant times, he was UPMC's Executive Vice President and Treasurer. He executed written stockholder consents on behalf of UPMC for certain agreements identified in the Amended Complaint, including the June 2016 Bridge Financing, the 2016 Note and Warrant Purchase Agreement, and the 2017 Series B Financing. He also attended an October 2017 Health Fidelity Board meeting at which the Board approved UPMC's 2017 Series B Financing discussed below.

[8] Whitehurst has been Health Fidelity's CEO since November 2014 and has served on the Board since December 2014.

[9] Gomulka was Health Fidelity's CFO from March 2017 to September 2019, and Chief Development Officer from September 2017 to December 2019. From 2016 until March 2017, he was an Executive in Residence at UPMC Enterprises.

[10] Huebner was appointed to the Board in August 2017 as the designee of the holders of the majority of the outstanding shares of common stock and preferred stock, voting as a class. Prior to serving on the Board, he was an Entrepreneur in Residence at UPMC Enterprises.

4

## B. The 2011 and 2014 Series A Financings

Health Fidelity consummated its first financing round in 2011, issuing preferred stock to the Charter Funds (the "2011 Series A Financing"). Schwarzer joined the Board as the Charter Funds' designee after the financing. Health Fidelity received additional financing in 2012 and 2013 through a series of convertible notes provided by the Charter Funds (the "Charter Convertible Notes").

At the end of 2013, two companies showed interest in acquiring Health Fidelity at a valuation of at least $25 million, and UPMC proposed an investment in an up-round financing on better terms than the 2011 Series A Financing.

Schwarzer offered to use his experience to negotiate a potential acquisition or financing transaction. According to Plaintiff, Schwarzer preferred a third-party financing over a potential acquisition because it was in Charter's best interest and concealed this preference from the Board.[11] Also, Schwarzer was motivated to seek a low valuation for Health Fidelity in connection with the financing round because the Charter Convertible Notes would convert on the same terms as the next third-party financing. In this way, Charter's interests aligned with UPMC's at the time. Thus, Plaintiff alleges that Schwarzer and Charter agreed to work with UPMC to

---

[11] Plaintiff alleges that the Charter Funds were required to distribute the proceeds from any exit in their Health Fidelity investments to the Charter Funds' investors. This distribution would reduce Charter Management's assets under management.

secure new financing at a low valuation. Schwarzer later pushed the Board to pursue the financing even as UPMC's terms grew less desirable to Health Fidelity.

After Schwarzer represented (falsely, according to Plaintiff) to the Board that the potential acquirers were no longer interested in Health Fidelity, Schwarzer informed the Board that Charter and UPMC had reached a side deal for UPMC to invest in Health Fidelity preferred stock. The agreement was not an up-round; rather, the financing would be on the same terms as the 2011 Series A Financing, despite Health Fidelity's interim growth.

The Board ultimately approved a $14 million financing in March 2014, in which Series A Preferred Stock was issued on the same terms as the 2011 Series A Financing (the "2014 Series A Financing"). The financing involved a $10.5 million investment from UPMC with the remainder coming from the conversion of the Charter Convertible Notes. UPMC also received warrants to purchase shares of Health Fidelity common stock and options to purchase additional shares of Series A Preferred Stock. The options were exercisable in three tranches. For each tranche, UPMC was required to notify the Company of its intention to exercise the options before December 31, 2014, July 30, 2015, and December 31, 2015, respectively.

6

Initially upon consummation of the 2014 Series A Financing, UPMC held approximately 49% of the fully diluted equity. The Charter Funds and Riskin each held minority positions.[12]

The 2014 Series A Financing ultimately delivered to UPMC over 50% of the fully diluted equity. UPMC subsequently exercised its option for all three tranches in 2014, 2015, and 2016. In the December 2014 closing, UPMC secured the majority of Health Fidelity's outstanding stock. Following the final Series A closing in January 2016, UPMC held approximately 70% of Health Fidelity's outstanding stock. The Charter Funds' and Riskin's interests were correspondingly diluted.

The 2014 Series A Financing also delivered control of the Board to UPMC through a voting agreement and an investors' rights agreement executed in connection with the financing. These agreements were amended in connection with subsequent financings. In its original form, the voting agreement provided for a five-person Board comprising a CEO designee, a Charter designee, two UPMC designees, and a Series A Preferred Stock designee. At all relevant times, UPMC held a majority of the outstanding shares of Series A Preferred Stock and therefore

---

[12] UPMC and the Charter Funds also held warrants to purchase 3,368,196 shares of common stock and 1,764,293 shares of common stock, respectively. At the time, there were approximately 50,000,000 shares of common stock outstanding.

selected the Series A designee. UPMC thus designated three of the five Board members.[13]

The investors' rights agreement provided each common and preferred stockholder a right of first refusal to acquire its pro rata share of new securities issued by the Company (the "ROFR"). The ROFR could be waived by a written consent signed by the Company and a majority of the stockholders.

## C.   The 2014 and 2015 Agreements Between Health Fidelity and UPMC

The Board removed Riskin as CEO in June 2014 and from the Board in July 2014. According to Plaintiff, UPMC removed him in order to put in place a CEO loyal to UPMC. Kuzmishin replaced Riskin on a temporary basis until Whitehurst

---

[13] As discussed below, the Board ultimately expanded to add a sixth seat mutually designated by the holders of preferred and common stock. Various defendants and non-parties shuttled in and out of the Board positions throughout the relevant time period. The following chart reflects, in an inexact fashion, the Board composition at various times.

| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|---|
| **CEO Designee** | Riskin | Whitehurst | | | | |
| **Charter Designee** | Schwarzer | | | | | DiScuillo |
| **UPMC Designee** | Kuzmishin | | | Burns | | |
| **UPMC Designee** | Kaul | Heppenstall | Burns | Jenkins | | |
| **Series A Designee** | Scott | | | | | |
| **Mutual Designee** | N/A | | | | Huebner | |

8

became CEO and the CEO Board designee in late 2014. Plaintiff alleges that Whitehurst lacked CEO experience but obtained the position because he was a personal friend of Burns, who was UPMC's Executive Vice President and served as a UPMC designee on the Board at various times.

Plaintiff alleges that UPMC used its newfound control over all aspects of the Company to force the Company to enter into self-dealing transactions with UPMC's affiliates.

In 2014 and 2015, Health Fidelity entered into several agreements with UPMC and its affiliates. The Amended Complaint identifies the following: a September 2014 master services agreement with UPMC Presbyterian; September 2014 and February 2015 statements of work in connection with the master services agreement for executive and staff augmentation services, respectively; a March 2014 joint development and license agreement with UPMC Presbyterian; and a July 2015 master consulting services agreement with UPMC Health Plan. This decision refers to these agreements collectively as the "2014 and 2015 UPMC Agreements."

Plaintiff alleges that the terms of the 2014 and 2015 UPMC Agreements were lucrative for UPMC and its affiliates but not beneficial to Health Fidelity. For example, UPMC Health Plan generated approximately $200 million in revenue from the 2014 and 2015 UPMC Agreements through 2018, while paying Health Fidelity less than $6.5 million. Other UPMC entities were paid various consulting, staff

9

augmentation, and executive fees.  In 2016, Health Fidelity generated $632,000 in revenue from UPMC but incurred operating costs and expenses attributable to UPMC entities of $558,230.

Plaintiff also alleges that, during this period, UPMC prevented Health Fidelity from offering its intellectual property, technology, and services to UPMC competitors and confined Health Fidelity's growth to transactions with UPMC and its affiliates.

### D.      The 2016 License Transaction

Health Fidelity acquired a short-term software license from UPMC in June 2016 (the "June 2016 License Transaction").  According to Plaintiff, the June 2016 License Transaction related to software Health Fidelity already had a license to use.  In exchange for the June 2016 License Transaction, Health Fidelity forgave $886,891 in debt owed by UPMC and provided UPMC with credits worth $1.27 million for future services.  The forgiven debt arose from the receivables owed by UPMC for its use of Health Fidelity's products and services since its investment in March 2014, none of which had been paid.  Months after providing UPMC with credits worth $1.27 million, Health Fidelity wrote down the value of the License to its then-current fair value of $100,000.

10

### E.    The June 2016 Bridge Financing

In June 2016, UPMC submitted a term sheet to Health Fidelity for a new convertible note financing (the "June 2016 Bridge Financing"). The term sheet provided for the issuance of $15 million in notes convertible into shares issued in Health Fidelity's next round of equity financing and at the price paid for the shares in that financing (the "Bridge Financing Convertible Notes"). The term sheet also provided for the issuance of warrants exercisable for three million shares of Health Fidelity common stock (the "Bridge Financing Warrants").

The Board approved terms proposed by UPMC at the end of a thirty-minute meeting attended by Health Fidelity's outside counsel, Health Fidelity's General Counsel, and four Board members—Kuzmishin, Scott, Whitehurst, and Schwarzer. The minutes of the meeting do not reflect the presentation or discussion of any financial analysis. Nor do they reflect any discussion of alternative financing or investment options.

UPMC and Charter approved the June 2016 Bridge Financing by written stockholder consent. The consent was executed on behalf of UPMC by Heppenstall and on behalf of one of the two Charter Funds by Schwarzer.

Under Section 228(e) of the Delaware General Corporation Law (the "DGCL"), when corporate action is taken by stockholder written consent and by less than unanimous written consent, the stockholders who did not consent must receive

11

prompt notice. The Company, however, did not provide notice of the June 2016 stockholder written consents to the non-consenting stockholders until December 7, 2016 (the "First Section 228(e) Notice").

The Board authorized a purchase agreement that would govern the Bridge Financing Convertible Notes and the Bridge Financing Warrants (the "Note and Warrant Purchase Agreement"). The agreement provided for the issuance of $10 million in Bridge Financing Convertible Notes and Bridge Financing Warrants exercisable for two million shares of common stock to UPMC. The agreement also provided Health Fidelity with the option of issuing an additional $5 million in Bridge Financing Convertible Notes and Bridge Financing Warrants exercisable for one million shares of common stock to UPMC by August 31, 2016.

Under the terms of the Note and Warrant Purchase Agreement, the exercise price of the Bridge Financing Warrants was the "fair market value of the Common Stock at the time of issuance of the Warrant, as determined by Health Fidelity's Board of Directors."[14] On June 30, 2016, Health Fidelity issued $10 million in Bridge Financing Convertible Notes and Bridge Financing Warrants exercisable for two million shares of common stock. According to Plaintiff, there is no record of the Board determining the fair market value of Health Fidelity's common stock at the time of the issuance.

---

[14] Am. Compl. ¶ 162.

Health Fidelity and UPMC amended the Note and Warrant Purchase Agreement in August 2016, October 2016, and January 2017, to extend the end dates for the optional portion of the June 2016 Bridge Financing to October 31, 2016, January 31, 2017, and March 31, 2017, respectively. On March 6, 2017, Health Fidelity consummated the optional portion of the June 2016 Bridge Financing with UPMC, issuing UPMC $5 million in Bridge Financing Convertible Notes and Bridge Financing Warrants exercisable for one million shares of common stock. Without further Board deliberation or approval, Whitehurst executed the additional Bridge Financing Convertible Notes and Bridge Financing Warrants on behalf of Health Fidelity. According to Plaintiff, there is no record of the Board determining the fair market value of Health Fidelity's common stock at the time of the issuance.

### F. The 2017 Series B Financing

The Board met in April 2017 to discuss further financing options. At the meeting, Whitehurst and Gomulka provided the Board with a presentation stating that Health Fidelity was seeking to raise $20–25 million in new funding. They noted that the financing was to "target customers and other strategic investors who can bring value from a revenue and market insight perspective," including "a select few private equity firms who have significant healthcare experience and connections."[15]

---

[15] *Id.* ¶ 201.

This discussion occurred in the presence of a number of non-director UPMC representatives who attended the meeting.[16]

### 1. Questa Proposes an Investment in Health Fidelity That Would Dilute UPMC's Interest.

In July 2017, Questa Capital ("Questa"), a venture capital firm that invests in healthcare startups, made a proposal to invest in a new series of Health Fidelity preferred stock. The term sheet contemplated an aggregate of $25 million of new capital, with Questa to provide $15–20 million. The proposal implied a $36.5 million pre-money valuation.

The term sheet further contemplated: (i) the issuance of new Series B Preferred Stock, which would receive a 6% dividend if and only if declared by Health Fidelity's Board, in exchange for the $25 million of new capital; (ii) the conversion of all outstanding Series A Preferred Stock into Series B Preferred Stock; (iii) the conversion of $15 million in outstanding convertible notes into shares of the Series B Preferred Stock; and (iv) a seven-person board of directors comprising three appointees of the Series B Preferred Stockholders (with Questa appointing two of those and another third-party investor appointing the third), two UPMC appointees so long as UPMC holds 50% of the new series, the CEO, and an outside industry

---

[16] In addition to the directors, the following persons attended the meeting: Huebner; David Gibson, the Portfolio Controller of UPMC Enterprises; and Eliza Swann, UPMC Enterprises' Senior Associate Counsel and Vice President.

expert approved unanimously by the other members of the board. If accepted, the term sheet would have provided the new investors with a 40.7% ownership interest in Health Fidelity and diluted UPMC's ownership interest in Health Fidelity to approximately 35%.

### 2. The Health Fidelity Board Adds an Additional Director Selected by UPMC.

Before the Board voted on Questa's financing proposal, UPMC and Charter expanded the Board to include an additional director. Doing so required amending Health Fidelity's Certificate of Incorporation and the then-operating voting and investor's agreements.

On August 22, 2017, UPMC and Charter executed and delivered stockholder consents purporting to amend the voting agreement (the "August 2017 Voting Agreement Amendment"). The amended agreement expanded the Board to six directors. The new spot would be filled by a so-called "Mutual Designee" to be elected by holders of preferred and common stock voting together.[17] Because UPMC held the majority of preferred and common stock taken together, UPMC elected the additional director. The parties to the voting agreement stipulated the

---

[17] Dkt. 64, Transmittal Aff. of Adam K. Schulman, Esq. in Supp. of Opening Br. of Defs. Raymond Scott, Fred Schwarzer, Charter Life Sciences (Ohio) II L.P., Charter Life Sciences II, L.P., CLS Partners II (Ohio), LLC, CLS Partners II, L.P., and CLS Management II, LLC in Supp. of Their Mot. to Dismiss Pl.'s Verified Am. Class Action and Derivative Compl. Ex. 4 §§ 2.1–2.5.

15

appointment of Huebner as the Mutual Designee. Huebner had been attending Board meetings for months and was a personal friend of Burns and Whitehurst, having taken ski trips with each. A stockholder consent approving the amendment to Health Fidelity's Certificate of Incorporation to expand the Board (the "August 2017 Certificate of Incorporation Amendment") was executed two days later.

### 3. UPMC Proposes a Financing Transaction and the Board Determines to Negotiate with UPMC and Not Questa.

Also on August 22, 2017, the Board held a meeting to discuss financing options for Health Fidelity. Huebner attended the meeting, ostensibly as a director, although the August 2017 Certificate of Incorporation had not yet been executed.[18] Non-director UPMC representatives also attended the meeting.

At the meeting, Whitehurst and Gomulka gave the Board another presentation regarding potential financing options including a term sheet submitted by UPMC. In some ways, the UPMC term sheet facially topped Questa's proposal by a slim margin—it contemplated a $15 million investment at a $37.5 million pre-money valuation for new Series B Preferred Stock. Some of the other terms, however, were more onerous than Questa's proposal. For example, UPMC's proposal included a mandatory annualized dividend of 8.3%. The term sheet further included a

---

[18] At the August 22, 2017 Board meeting, Huebner was listed as a "Director[] Attending the Meeting," and "Burns welcomed Mr. Huebner as a new Company Director." Cumings Aff. Ex. L at 1.

16

sweetener for management—a put right that provided management the right to sell their shares at fair market value.

Whitehurst and Gomulka compared the terms of the Questa and UPMC term sheets. They also provided "Preference Waterfall Scenarios" by tweaking the UPMC proposal.[19] The presentation did not include similar waterfall scenarios for the Questa proposal.

At this point, only Questa and UPMC had submitted proposals, but the presentation noted that Health Fidelity had reached out to about 50 firms, and had "held substantive discussions with 35+ strategic and growth equity firms."[20] The presentation stated that Health Fidelity was in "active discussions with 10 firms and [was] continuing to add more to the mix as other drop[ped] out."[21] One of these firms was BlueCross BlueShield Venture Partners ("BCBS Venture Partners"). The presentation explained that other potential investors provided "recurring feedback that there were challenges relating to UPMC, including (i) its control position and

---

[19] *See* Cumings Aff. Ex. K. They did so by analyzing three capital structure scenarios: (i) adding participating Series B Preferred Stock; (ii) adding non-participating Series B Preferred Stock; and (iii) adding non-participating Series B Preferred Stock and converting outstanding Series A Preferred Stock to non-participating Series A Preferred Stock.

[20] Cumings Aff. Ex. K.

[21] *Id.*; *accord.* Am. Compl. ¶ 224.

exit thesis, and (ii) a condition to closing being a commercial contract with UPMC Enterprises that was representative of market pricing."[22]

The concluding slide of the presentation referred to the UPMC term sheet as "the recommended term sheet."[23] After the presentation, the Board directed management to continue negotiating with UPMC but not with Questa.

### 4. Questa Attempts to Top UPMC's Proposal.

Health Fidelity's Board met again on October 5, 2017, to consider financing options. In addition to the Board members, Gomulka and three non-director UPMC representatives were present.

At the meeting, Whitehurst and Gomulka provided the Board with another presentation regarding financing options. The presentation included revised term sheets from Questa and UPMC.

Questa's revised proposal had an increased purchase price, reflecting a $38 million pre-money valuation. Rather than requiring Series A Preferred Stock to automatically convert into common stock as its previous term sheet stipulated, the revised proposal provided an option for holders of Series A Preferred Stock to waive their participation and anti-dilution rights (but remain holders of Series A Preferred Stock). The presentation indicated that the Questa proposal "would have allowed

---

[22] Am. Compl. ¶ 227 (internal quotation markets omitted).

[23] *See id.* ¶ 230; Cumings Aff. Ex. K.

18

for accelerate[d] product development and commercial growth by raising $25 million, which would benefit investors [sic] equity value and provide new connections, customer introductions and other value through a new investment partner."[24] Additionally, the proposal would allow BCBS Venture Partners to participate in the financing.

UPMC's revised term sheet still contemplated a $37.5 million pre-money valuation, but it included three changes from the original proposal: (i) it included a $10 million investment from UPMC and $5 million investment from Charter, rather than a $15 million investment from UPMC; (ii) it removed the participation right of the new security; and (iii) it stated that UPMC was "open" to the possibility of an investment of up to $5 million from outside investors.[25] The presentation also noted an "inability" of BCBS Venture Partners to be part of the UPMC-led round, which "could hinder penetration into [BCBS Venture Partners'] market."[26] Plaintiff attributes this "inability" to a contentious relationship between UPMC and BCBS Venture Partners.

In addition to outlining each revised proposal, the presentation included: an analysis of Health Fidelity's short term cash flow; a comparison of the two term

---

[24] *Id.* ¶ 237 (alteration in original) (internal quotation marks omitted); *see also* Cumings Aff. Ex. M (presentation materials) (listing the "Positives" of the Questa proposal).

[25] Am. Compl. ¶¶ 238–40, 243.

[26] Cumings Aff. Ex. M.

sheets; and lists of "Positives" and "Challenges" with respect to each of the term sheets.[27] One of the positives listed under the UPMC proposal was: "No change to governance structure."[28]

The presentation concluded that, "[a]bsent a Questa term sheet with BCBS [Venture Partners] participation in a buyout scenario, [our] recommendation is to move forward with a UPMC term sheet with requested changes."[29] Those changes were: allowing more favorable treatment for employee options in a put scenario; considering acceleration of new option grants for employees in line with vesting for tenured management; and bringing in co-investors with strong ties to the healthcare market.

After the presentation, the Board scheduled a telephonic follow-up meeting for the following day.

### 5. The Board Approves UPMC's Series B Financing Proposal.

On October 6, 2017, the Board held another meeting to further consider financing options for the Company. Gomulka and a non-director UPMC representative were also present at the meeting.

---

[27] *Id.*

[28] Am. Compl. ¶ 247; Cumings Aff. Ex. M.

[29] Cumings Aff. Ex. M.

At the meeting, Whitehurst gave a presentation on financing options, which noted that a "take-away point[]" from the previous Board meeting was: "Questa is a no; internally led round preferred path."[30] The Board approved a modification to the UPMC term sheet that addressed near-term liquidity concerns—Charter had been unable to secure liquid investment capital to make the $5 million investment, but it was continuing to seek it. Health Fidelity therefore needed a liquidity infusion to operate in the interim.

The Board also approved the addition of a forced-auction right that required UPMC to either vote in favor of a bona fide offer or purchase the shares of the non-controlling stockholders for the same price.

After the presentation, "[t]he Board directed management to proceed with closing the financing as set forth in the UPMC Term Sheet, incorporating the Liquidity Concepts, and allowing time for Charter to participate" and noted that "UPMC agreed to provide financing to the Company during such time through license fees for Company products."[31]

Charter ultimately failed to secure sufficient investment capital to participate in the financing, and UPMC did not bring on outside investors to provide the additional $5 million.

---

[30] Cumings Aff. Ex. O (presentation materials).

[31] Cumings Aff. Ex. N at 1–2.

UPMC ultimately presented a revised term sheet, which the Board approved in December 2017. Under the final terms of the financing (the "2017 Series B Financing"), UPMC invested $15 million in Health Fidelity at a price of $0.118 per share (a 7% reduction from the $0.1207 per share price), and converted the Bridge Financing Convertible Notes into 265,543,905 shares of Series B Preferred Stock. The final purchase price represented a 72.24% decrease in the purchase price per share paid in the 2014 Series A Financing and three optional closings that continued into January 2016.

The Board did not meet between the October 2017 meeting and December 2017 written consent to discuss the decrease in price relative to the previous term sheet contemplated by the final UPMC proposal.

Acting by written consent on December 21, 2017, the Board approved the Series B Financing and recommended an amendment to Health Fidelity's Certificate of Incorporation.

After the Board approved the 2017 Series B Financing, Heppenstall executed a stockholder consent on behalf of UPMC approving the 2017 Series B Financing and authorizing the amendment to the Certificate of Incorporation.[32] The Company did not provide the notice to non-consenting stockholders mandated by Section 228(e) until August 17, 2018 (the "Second Section 228(e) Notice"). The Second

---

[32] It also purported to waive of the ROFR possessed by Health Fidelity stockholders.

22

Section 228(e) Notice did not provide details about the Series B Financing's purchase price, the number of shares issued, or UPMC's involvement as the sole investor.[33]

### G.    The Equity Plan

Throughout the relevant time period, the Board adopted amendments to Health Fidelity's equity incentive plan (the "Equity Plan"). According to Plaintiff, UPMC implemented these amendments in order to facilitate option grants intended "to keep Health Fidelity's management loyal to UPMC."[34]

Most of the Equity Plan amendments identified in the Amended Complaint increased the number of shares authorized for issuance under the plan.  When adopted in 2011, the Equity Plan authorized the issuance of 9,767,077 shares of common stock; nearly 8,000,000 shares were still available for future grants.  The Board amended the plan in June 2015, January 2016, December 2016, and

---

[33] The document provided notice of the "[a]doption by written consent of the recitals and resolutions of the stockholders of Health Fidelity, approving in connection with Health Fidelity's [Series B Financing]:  (i) an amendment and restatement of Health Fidelity's Certificate of Incorporation, (ii) Health Fidelity's sale of Series B Preferred Stock, (iii) an increase to the amount of shares reserved under Health Fidelity's 2011 Equity Incentive Plan, and (iv) waiver of certain preferred stockholder rights with respect to the financing." Am. Compl. ¶ 313.

[34] Am. Compl. ¶ 117.

December 2017, to increase the number of shares authorized for issuance to 14,484,433, 16,843,111, 19,843,111, and 80,993,111, respectively.[35]

In June 2016, the Board amended the Equity Plan by changing the definition of "Change of Control," the occurrence of which could trigger the vesting of the options (the "June 2016 Equity Plan Amendment").[36] The Board expanded the definition to include:

> [A]ny transaction or series of related transactions (including, without limitation, any reorganization, merger or consolidation or stock transfer) pursuant to which [UPMC] or any affiliate thereof (a) holds, immediately after such transaction or series of related transactions, at least ninety (90%) of the voting power of the surviving or acquiring entity, or (b) becomes the sole outside investor other than (i) past or current employees, consultants or advisors and (ii) Columbia University or its affiliates or transferees.[37]

The Amended Complaint also identifies certain option grants. In 2015, Health Fidelity granted stock-based compensation in the form of options exercisable for 4,126,911 shares of common stock (the "2015 Option Grants"). The options carried a weighted-average exercise price of $0.06 per share, which was established by the

---

[35] In all instances, the required stockholder approval was obtained by written consent. The consent approving the first of these two amendments bore the name of a UPMC subsidiary, UPMC Presbyterian, and not the stockholder of record, UPMC. Heppenstall executed the third stockholder written consent on behalf of UPMC.

[36] Am. Compl. ¶ 154.

[37] *Id.* ¶ 155.

24

Board based on the fair value of its common stock as of the option grant date, pursuant to Internal Revenue Code Section 409A.

In 2017, after the Board approved the 2017 Series B Financing, it granted options exercisable for 2,222,000 shares of common stock to each of Huebner and Scott (the "2017 Option Grant"). This was a considerable increase over the amount of prior stock issuances to each of them. In the previous six years that Scott served as a director, he had been granted, in total, options exercisable for 300,000 shares of common stock.

Plaintiff contrasts UPMC's willingness to compensate Health Fidelity's directors and management with UPMC's negotiations to acquire Plaintiff's stock. In early 2016, Riskin and UPMC reached a tentative agreement to buy Riskin's 8,113,917 shares of Health Fidelity common stock at $0.4559 per share (i.e., $3,699,134.76). The terms were approved by the Board, but the deal was never consummated.

**H.      Riskin Seeks Health Fidelity Books and Records and Files This Litigation.**

In 2018, Riskin served five demands to inspect Health Fidelity's books and records pursuant to Section 220 of the DGCL. In response, the Company produced documents, including its incorporation documents, Board minutes and materials,

director and stockholder written consents, and certain Company financial and investment information.[38]

On June 14, 2019, Plaintiff, Health Fidelity, UPMC, UPMC Presbyterian, and UPMC Health Plan entered into an agreement that tolled the statute of limitations for Plaintiff's claims as of June 14, 2019 (the "Tolling Agreement").[39]

Plaintiff filed this lawsuit on July 24, 2019.[40]  The Amended Complaint contains seven counts.

In Count I, Plaintiff asserts direct claims for breach of fiduciary duty against the UPMC Defendants, the Charter Defendants, Whitehurst, Huebner, and Gomulka, in connection with the transactions that Plaintiff vaguely refers to as the "Challenged Transactions."  The Challenged Transactions potentially include the following transactions discussed in the Amended Complaint:

- The 2014 and 2015 UPMC Agreements;

---

[38] The parties have agreed that all documents produced by Health Fidelity in response to Riskin's Section 220 request are incorporated by reference into the Amended Complaint.

[39] Dkt. 75, Transmittal Aff. of Angela Lam in Supp. of Pl.'s Answering Br. in Opp'n to Defs.' Mots. To Dismiss the Verified Am. Class Action and Derivative Compl. Ex. 1 (Tolling Agreement).  Plaintiff states that the "Health Fidelity Defendants," a term defined to include the individual defendants, were parties to the Tolling Agreement.  Dkt. 74, Pl.'s Answering Br. in Opp'n to Defendants' Mot. to Dismiss the Verified Am. Class Action and Derivative Compl. ("Pl.'s Answering Br.") at 76, 77, 81.  But an examination of the agreement itself reveals that the individual defendants were not parties to the agreement. *See* Tolling Agreement.

[40] Dkt. 1, Verified Compl. Seeking Declaratory J. and Rescissory and Monetary Damages Relating to Majority Stockholder's, Officers', and Directors' Breaches of Fiduciary Duty and Violations of Sections 152, 157, and 228 of the DGCL.

- The June 2015 Equity Plan Amendment;

- The 2015 Option Grants;

- The January 2016 Equity Plan Amendment;

- The June 2016 License Transaction;

- The June 2016 Equity Plan Amendment;

- The June 2016 Bridge Financing;

- The December 2016 Equity Plan Amendment;

- The August 2017 Voting Agreement Amendment;

- The 2017 Series B Financing;[41]

- The August 2017 Certificate of Incorporation Amendment; and

- The December 2017 Equity Plan Amendment.

In Count II, in the alternative to the direct claims asserted in Count I, Plaintiff asserts derivative claims for breach of fiduciary duty against all Defendants except Health Fidelity with respect to the Challenged Transactions.

In Count III, Plaintiff asserts claims for aiding and abetting in the breaches of fiduciary duty alleged in Counts I and II against all Defendants except for Health Fidelity to the extent that they did not owe fiduciary duties at the relevant time.

In Count IV, Plaintiff seeks a declaratory judgment against Health Fidelity that the First and Second Section 228(e) Notices concerning stockholder consents as

---

[41] Because the 2017 Option Grant was contingent on the approval of the 2017 Series B Financing, this decision combines the analysis of the transactions.

to the June 2016 Bridge Financing and 2017 Series B Financing, respectively, were insufficient under Delaware law.

In Count V, Plaintiff seeks a declaratory judgment against Health Fidelity that the Company violated Section 157 of the DGCL in connection with issuing the Bridge Financing Warrants.

In Count VI, Plaintiff seeks a declaratory judgment against Health Fidelity that the Company violated DGCL Section 242 in connection with the August 2017 Certificate of Incorporation Amendment.

In Count VII, Plaintiff asserts claims of unjust enrichment against all Defendants except Health Fidelity to the extent the damage or harm is not remedied by relief granted in response to Counts I–VI.[42]

Each of the three groups of Defendants filed motions to dismiss the complaint on October 9, 2019.[43] Plaintiff amended his complaint in response,[44] and Defendants renewed their motions to dismiss on February 7, 2020.[45] The parties completed

---

[42] Plaintiff also asserts Counts IV–VI against "all Controller Defendants to the extent they contest the declarations sought." Am. Compl. ¶¶ 443, 450, 458.

[43] *See* Dkt. 25, Defs. Health Fidelity, Incorporated, John Stephen Whitehurst, Scott Huebner, and Craig Gomulka's Mot. to Dismiss the Verified Compl.; Dkt. 28, The UPMC Defs.' Mot. to Dismiss the Verified Compl.; Dkt. 29, Mot. to Dismiss Pl.'s Verified Compl.

[44] Am. Compl.

[45] *See* Health Fidelity Defs.' Opening Br.; Dkt. 63, The UPMC Defs.' Opening Br. in Supp. of Their Mot. to Dismiss the Verified Am. Class Action and Derivative Compl. ("UPMC Defs.' Opening Br."); Dkt. 64, Opening Br. of Defs. Raymond Scott, Fred Schwarzer, Charter Life Sciences (Ohio) II, L.P., Charter Life Sciences II, L.P., CLS Partners II (Ohio), LLC, CLS Partners II, L.P. and CLS Management II, LLC in Supp. of Their Mot. to

briefing on May 22, 2020,[46] and the court held oral argument on September 14, 2020.[47]

## II. LEGAL ANALYSIS

Plaintiff's expansive claims inspired dismissal arguments equally punishing in scope. This decision addresses the dismissal arguments with respect to Count I and portions of Count II only. All Defendants have moved to dismiss Count I under Court of Chancery Rule 12(b)(6).[48] All Defendants have moved to dismiss portions of Count II on the basis of laches. All Defendants except for UPMC and its director designees—Burns, Jenkins, and Kuzmishin—have moved to dismiss the remainder of Count II. As to Count II, this decision addresses the laches argument and Charter's motion to dismiss only.

---

Dismiss Pl.'s Verified Am. Class Action and Derivative Compl ("Charter Defs.' Opening Br.").

[46] *See* Health Fidelity Defs.' Opening Br.; UPMC Defs.' Opening Br.; Charter Defs.' Opening Br.; Pl.'s Answering Br.; Dkt. 80, Reply Br. of Defs. Raymond Scott, Fred Schwarzer, Charter Life Sciences (Ohio) II, L.P., Charter Life Sciences II, L.P., CLS Partners II (Ohio), LLC, CLS Partners II, L.P. and CLS Management II, LLC in Supp. of Their Mot. to Dismiss Pl.'s Verified Am. Class Action and Derivative Compl. ("Charter Defs.' Reply Br."); Dkt. 81, The UPMC Defs.' Reply Br. in Supp. of Their Mot. to Dismiss the Verified Am. Class Action and Derivative Compl. ("UPMC Defs.' Reply Br."); Dkt. 82, Health Fidelity, Incorporated, John Stephen Whitehurst, Scott Huebner, and Craig Gomulka's Reply Br. in Supp. of Their Mot. to Dismiss the Verified Am. Compl. ("Health Fidelity Defs.' Reply Br.").

[47] Dkt. 93, Tr. of Sept. 14, 2020 Telephonic Oral Arg. on Defs.' Mots. to Dismiss. The motions were fully submitted on September 29, 2020, when the parties filed a "Chart Summarizing Dismissal Arguments." *See* Dkt. 92.

[48] *See* Chart Summary of Dismissal Args. Although Count II is a derivative claim, none of Defendants have moved to dismiss pursuant to Court of Chancery Rule 23.1. *See id.*

"[T]he governing pleading standard in Delaware to survive a motion to dismiss is reasonable 'conceivability.'"[49]  When considering a motion under Rule 12(b)(6), the Court must "accept all well-pleaded factual allegations in the [c]omplaint as true . . . , draw all reasonable inferences in favor of the plaintiff, and deny the motion unless the plaintiff could not recover under any reasonably conceivable set of circumstances susceptible of proof."[50]  The Court, however, need not "accept conclusory allegations unsupported by specific facts or . . . draw unreasonable inferences in favor of the non-moving party."[51]

## A.    Count I Is Dismissed.

In Count I, Plaintiff asserts a direct claim for breach of fiduciary duty under the "dual claim" theory of *Gentile v. Rossette*.[52]  The Amended Complaint asserts Count I as to a vague group of "Challenged Transactions," but in briefing Plaintiff only makes substantive arguments as to the 2017 Series B Financing.  The Amended

---

[49] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 537 (Del. 2011).

[50] *Id.* at 536 (citing *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002)).

[51] *Price v. E.I. du Pont de Nemours & Co., Inc.*, 26 A.3d 162, 166 (Del. 2011) (citing *Clinton v. Enter. Rent-A-Car Co.*, 977 A.2d 892, 895 (Del. 2009)), *overruled on other grounds by Ramsey v. Ga. S. Univ. Advanced Dev. Ctr.*, 189 A.3d 1255 (Del. 2018).

[52] 906 A.2d 91 (Del. 2006).

Complaint asserts Count I as to all Defendants, but in briefing Plaintiff abandoned Count I as to Heppenstall, UPMC Presbyterian, and UPMC Health Plan.[53]

In essence, Plaintiff claims that the participants in the 2017 Series B Financing received stock at an unfair price. Corporate overpayment claims of this nature are quintessentially derivative.[54] In *Gentile*, however, the Delaware Supreme Court recognized "a species of corporate overpayment claim" that a stockholder can assert both derivatively *and* directly:

> A breach of fiduciary duty claim having this dual character arises where: (1) a stockholder having majority or effective control causes the corporation to issue "excessive" shares of its stock in exchange for assets of the controlling stockholder that have a lesser value; and (2) the exchange causes an increase in the percentage of the outstanding shares owned by the controlling stockholder, and a corresponding decrease in the share percentage owned by the public (minority) shareholders. Because the means used to achieve that result is an overpayment (or "over-issuance") of shares to the controlling stockholder, the corporation is harmed and has a claim to compel the restoration of the value of the overpayment. That claim, by definition, is derivative.

> But, the public (or minority) stockholders also have a separate, and direct, claim arising out of that same transaction. Because the shares representing the "overpayment" embody both economic value and voting power, the end result of this type of transaction is an

---

[53] Plaintiff waives any arguments under Count I as to the other transactions and against these Defendants. *See Emerald P'rs v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) ("Issues not briefed are deemed waived.").

[54] *See, e.g.*, *Gentile*, 906 A.2d at 99 ("Normally, claims of corporate overpayment are treated as causing harm solely to the corporation and, thus, are regarded as derivative.").

31

improper transfer—or expropriation—of economic value and voting power from the public shareholders to the majority or controlling stockholder. For that reason, the harm resulting from the overpayment is not confined to an equal dilution of the economic value and voting power of each of the corporation's outstanding shares. A separate harm also results: an extraction from the public shareholders, and a redistribution to the controlling shareholder, of a portion of the economic value and voting power embodied in the minority interest. As a consequence, the public shareholders are harmed, uniquely and individually, to the same extent that the controlling shareholder is (correspondingly) benefited.[55]

Put differently, "the harm *Gentile* seeks to remedy arises 'when a controlling stockholder, with sufficient power to manipulate the corporate processes, engineers a dilutive transaction whereby that stockholder receives an exclusive benefit of increased equity ownership and voting power for inadequate consideration.'"[56]

The Delaware Supreme Court narrowly construed the *Gentile* doctrine in *El Paso Pipeline GP Co. v. Brinckerhoff*.[57] There, a limited partner challenged alleged overpayments to a controller that reduced the limited partners' economic interests but not their voting rights.[58] The Court distinguished the facts of *Gentile*, where the challenged transactions "resulted in an improper transfer of both economic

---

[55] *Id.* at 99–100.

[56] *Klein v. H.I.G. Cap., L.L.C.*, 2018 WL 6719717, at *6 (Del. Ch. Dec. 19, 2018) (quoting *Feldman v. Cutaia*, 956 A.2d 644, 657 (Del. Ch. 2007), *aff'd*, 951 A.2d 727 (Del. 2008)).

[57] *See* 152 A.3d 1248 (Del. 2016).

[58] *Id.* at 1264.

value *and* voting power from the minority stockholders to the controlling stockholder," and declined to apply *Gentile* on this basis.[59]

"In the wake of *El Paso*, [the Court of Chancery] has exercised caution in applying the *Gentile* framework, commenting in one case that '[w]hether *Gentile* is still good law is debatable' and finding in another that '*Gentile* must be limited to its facts.'"[60] Two decisions of this court have declined to apply the *Gentile* framework in cases challenging the issuance of convertible preferred stock with voting rights.[61]

In *Klein*, a 54% stockholder sold its stake in the company to a third party.[62] In connection with that sale, the company issued preferred stock (with voting rights) to the buyer, which the plaintiffs alleged was undervalued and diluted the plaintiff's common stock.[63] The court held that the transaction did not fit within the *Gentile*

---

[59] *Id.* at 1263–64. In a concurring opinion, then-Chief Justice Strine urged his colleagues to overrule *Gentile*. *Id.* at 1266 (Strine, C.J., concurring).

[60] *Klein*, 2018 WL 6719717, at *7 (alteration in original) (first quoting *ACP Master, Ltd. v. Sprint Corp.*, 2017 WL 3421142, at *26 n.206 (Del. Ch. July 21, 2017), *aff'd*, 2018 WL 1905256 (Del. Apr. 23, 2018); and then quoting *Sciabacucchi v. Liberty Broadband Corp.*, 2018 WL 3599997, at *10 (Del. Ch. July 26, 2018)).

[61] *See Reith v. Lichtenstein*, 2019 WL 2714065, at *1, 12 (Del. Ch. June 28, 2019); *Klein*, 2018 WL 6719717, at *1, 7.

[62] *Klein*, 2018 WL 6719717, at *1, 3.

[63] *Id.* at *1, 3–5.

framework, primarily because there was no pre-existing controller; rather, the transaction at issue caused the buyer to obtain control.[64]

As a secondary basis for this ruling, the court noted that *even if* the buyer had been a controller before the preferred stock was issued, the transaction at issue would not fit within the *Gentile* framework.[65] The court reasoned that, "all else being equal, the minority stockholders' aggregate percentage of the Company's common stock would not be reduced until such time, *if ever*, that the Preferred Stock is converted into common stock—an event that is not alleged to have occurred."[66] The court then distinguished *In re Nine Systems Corp. Stockholders Litigation*,[67] where "the court applied *Gentile* to a recapitalization that resulted in the issuance of convertible preferred stock," on the ground that "the preferred shares in *Nine Systems* had been converted into common shares that were cashed out in a merger before the lawsuit was filed, resulting in a dilution of the economic rights of the minority common stockholders so that they received a lower percentage of the merger consideration."[68] The court in *Klein* concluded that, although the issuance of preferred stock impacted

---

[64] *Id.* at *6–8.

[65] *Id.* at *8.

[66] *Id.*

[67] 2014 WL 4383127, at *23–26 (Del. Ch. Sept. 4, 2014).

[68] *Klein*, 2018 WL 6719717, at *8 n.79.

34

the common stockholders' voting power, there was no "transfer of economic value normally contemplated in a *Gentile* claim."[69]

This court later applied the secondary reasoning of *Klein* to a factually apposite scenario in *Reith*, which involved facts similar to those presented in *Klein* except that there was a pre-transaction controller.[70] The controller issued itself allegedly undervalued preferred stock (with voting rights) in connection with an acquisition.[71] Drawing on *Klein*, the court concluded that the claims should be analyzed as derivative because they did not dilute the economic value of the common stock.[72]

*Klein* and *Reith* stand for the proposition that the issuance of a convertible preferred stock, pre-conversion, does not constitute a transfer of economic value sufficient to support a direct claim under *Gentile*. There is room to dispute this proposition. But as a means of distinguishing *Gentile*, these decisions are consistent with the current trend in Delaware law of construing *Gentile* narrowly.[73]

---

[69] *Id.* at *8.

[70] *See* 2019 WL 2714065, at *5, 8–12.

[71] *Id.* at *1, 9–10.

[72] *See id.* at *12.

[73] *See generally In re TerraForm Power, Inc. S'holders Litig.*, 2020 WL 6375859, at *16 (Del. Ch. Oct. 30, 2020) (observing that the key "takeaway from *El Paso* is that '*Gentile* and its progeny should be construed narrowly' and that '*Gentile* must be limited to its facts'" (first quoting *Mesirov v. Enbridge Energy Co.*, 2018 WL 4182204, at *8 n.77 (Del. Ch. Aug. 29, 2018); and then quoting *Sciabacucchi v. Liberty Broadband Corp.*, 2018 WL 3599997, at *10 (Del. Ch. July 26, 2018))).

35

This decision declines to buck the trend. In this case, the 2017 Series B Financing involves the issuance of preferred stock, which has not been converted. Under *Klein* and *Reith*, that alleged harm does not constitute a transfer of economic value sufficient to support a claim under *Gentile*. Because the 2017 Series B Financing does not fit the transactional paradigm of *Gentile*, Plaintiff's fiduciary duty claim is derivative in nature.[74]

Count I is therefore dismissed.

## B.     Count II Is Dismissed in Part.

In Count II, Plaintiff asserts derivative claims as to various transactions spanning over five years.[75] Defendants have moved to dismiss Count II as to certain transactions that occurred on or before June 2016 under the doctrine of laches, and this decision grants that motion in part. Charter has moved to dismiss Count II on

---

[74] Plaintiff cites *Loral Space & Communications, Inc. v. Highland Crusader Offshore Partners, L.P.* as support for its direct claim. Pl.'s Answering Br. at 84–88 (citing 977 A.2d 867 (Del. 2009)). But, there, the court was deciding the question of whether "stockholders may . . . pursue a class action where . . . there is a pending derivative action addressing the same alleged wrongs." *Loral*, 977 A.2d at 869. The court did not address the question of whether the issuance of preferred stock can give rise to a direct claim under *Gentile*.

[75] As discussed above, aside from the laches argument, neither UPMC nor its director designees—Burns, Jenkins, and Kuzmishin—moved to dismiss Count II. This is presumably because, during the relevant time period, UPMC owned a majority stake in Health Fidelity and was thus concededly a controlling stockholder with concomitant fiduciary obligations. The UPMC Affiliates, Heppenstall, the Health Fidelity Defendants, Schwarzer, and Scott have moved to dismiss all of Count II as to them. Their arguments will be addressed by the court separately.

the grounds it did not owe fiduciary duties, and this decision grants that motion as well.

### 1. Portions of Count II Are Time-Barred.

When allegations reach back in time as far as those contained in the Amended Complaint, it is logical to first inquire as to whether aspects of the claims are time-barred. Under the doctrine of laches, a claim that would be barred by the applicable statute of limitations if pursued at law will be barred in equity absent tolling or extraordinary circumstances.[76] Plaintiff's claim for breach of fiduciary duty is subject to a three-year statute of limitations period that begins to run absent tolling when the alleged wrongful act is committed.[77]

Plaintiff filed this suit on July 24, 2019, which would make July 24, 2016, the default cut-off date.

Plaintiff challenges the following events that occurred before July 24, 2016:

- The 2014 and 2015 UPMC Agreements;

- The June 2015 Equity Plan Amendment;

- The 2015 Option Grants;

- The January 2016 Equity Plan Amendment;

---

[76] *Whittington v. Dragon Gp., L.L.C.*, 991 A.2d 1, 7–10 (Del. 2009); *see also Silverberg v. Padda*, 2019 WL 4566909, at *9–11 (Del. Ch. Sept. 19, 2019); *Kraft v. WisdomTree Invs., Inc.*, 145 A.3d 969, 978–79 (Del. Ch. 2016).

[77] 10 *Del. C.* § 8106; *see also Smith v. McGee*, 2006 WL 3000363, at *3 (Del. Ch. Oct. 16, 2006).

- The June 2016 License Transaction;

- The June 2016 Equity Plan Amendment; and

- The June 2016 Bridge Financing.[78]

Plaintiff argues that challenges to these transactions are not time-barred for two reasons. First, he entered into the Tolling Agreement. Second, the delay in sending notices or disclosing information equitably tolled any analogous statute of limitations.

Plaintiff's first argument based on the Tolling Agreement is effective, but only as to certain transactions and certain Defendants. The Tolling Agreement established a June 14, 2016 cut-off and does not preserve Plaintiff's challenges to events that occurred prior to that time.[79] At most, the agreement preserves otherwise time-barred claims as to the June 2016 License Transaction, the June 2016 Equity

---

[78] Plaintiff challenges the following events that occurred after July 24, 2016:
- The December 2016 Equity Plan Amendment;
- The August 2017 Voting Agreement Amendment;
- The 2017 Series B Financing;
- The August 2017 Certificate of Incorporation Amendment; and
- The December 2017 Equity Plan Amendment.

[79] Those transactions include the 2014 and 2015 UPMC Agreements, the June 2015 Equity Plan Amendment, the 2015 Option Grants, and the January 2016 Equity Plan Amendment. *See* Charter Defs.' Reply Br. at 26–27 (regarding the June 2015 Equity Plan Amendment, the January 2016 Equity Plan Amendment, the June 2016 License Transaction, the June 2016 Equity Plan Amendment, and the June 2016 Bridge Financing); UPMC Reply Br. at 19 (regarding the 2014 and 2015 UPMC Agreements).

Plan Amendment, and the June 2016 Bridge Financing to the extent they occurred before June 14, 2016.[80] Also, the only Defendants that were parties to the Tolling Agreement were Health Fidelity, UPMC, UPMC Presbyterian, and UPMC Health Plan. So, at most, the Tolling Agreement preserves the otherwise time-barred claims against those Defendants.

Plaintiff's second argument based on equitable tolling is also effective, but also only to a limited degree. "Under the doctrine of equitable tolling, 'the statute of limitations is tolled for claims of wrongful self-dealing, even in the absence of actual fraudulent concealment, where a plaintiff reasonably relies on the competence and good faith of a fiduciary.'"[81] If a plaintiff meets this burden and equitable tolling applies, the statute of limitations is tolled until the plaintiff was "objectively aware of the facts giving rise to the wrong, *i.e.*, on inquiry notice."[82] A party is objectively aware when "persons of ordinary intelligence and prudence have facts sufficient to

---

[80] The Amended Complaint does not provide exact dates for these transactions. If the transactions occurred after June 14, 2016, then the challenges are not time-barred because the transaction occurred in the three years before the complaint was filed.

[81] *Microsoft Corp. v. Amphus, Inc.*, 2013 WL 5899003, at \*17 (Del. Ch. Oct. 31, 2013) (quoting *Weiss v. Swanson*, 948 A.2d 433, 451 (Del. Ch. 2008)).

[82] *In re Am. Int'l Gp., Inc.*, 965 A.2d 763, 812 (Del. Ch. 2009) (emphasis omitted) (quoting *In re Dean Witter P'ship Litig.*, 1998 WL 442456, at \*6 (Del. Ch. July 17, 1998)).

place them on injury notice which, if pursued, would lead to discovery of the injury."[83]

Plaintiff directs its equitable-tolling argument to the Equity Plan amendments (executed in June 2015, January 2016, and June 2016), the June 2016 License Transaction, and the June 2016 Bridge Financing.[84]

As to the June 2015 Equity Plan Amendment and the January 2016 Equity Plan Amendment, Plaintiff signed stockholder written consents proximate to the time of their adoption. Plaintiff argued that he was unaware at the time he executed the consents that "the true purpose of those consents was to keep Health Fidelity fiduciaries loyal to UPMC and give UPMC more control over Health Fidelity,"[85] but Plaintiff was aware at that time that UPMC held a majority position in Health Fidelity and designated a majority of the Board. These facts were enough to place Plaintiff on inquiry notice in connection with the June 2015 Equity Plan Amendment

---

[83] *Capano v. Capano*, 2014 WL 2964071, at *9 (Del. Ch. June 30, 2014) (quoting *Eluv Hldgs. (BVI) Ltd. v. Dotomi, LLC*, 2013 WL 1200273, at *7 (Del. Ch. Mar. 26, 2013)); *accord. Coleman v. PricewaterhouseCoopers, LLC*, 854 A.2d 838, 842 (Del. 2004); *see also In re Tyson Foods, Inc.*, 919 A.2d 563, 585 (Del. Ch. 2007) ("Even where a defendant uses every fraudulent device at its disposal to mislead a victim or obfuscate the truth, no sanctuary from the statute will be offered to the dilatory plaintiff who was not or should not have been fooled.").

[84] Pl.'s Answering Br. at 75 & n.23.

[85] *Id.* at 80–81.

40

and the January 2016 Equity Plan Amendment. So challenges to those transactions are not tolled and are thus time-barred.

Plaintiff's equitable-tolling argument has more traction as to the other transactions. The Company had an obligation to provide "[p]rompt notice" to Plaintiff of the stockholder consents executed in connection with the June 2016 Equity Plan Amendment and the June 2016 Bridge Financing,[86] but the Company did not provide the First Section 228(e) Notice until December 2016. As to the June 2016 License Transaction, Plaintiff alleges that he learned about the transaction when the Company provided him with the 2016 auditor report in 2018. Generally, whether equitable tolling applies raises a fact-intensive inquiry that is not amenable to a motion to dismiss.[87] Thus, although it is slim reed, Plaintiff has pled facts giving rise to a reasonable inference that equitable tolling may apply to these transactions.[88]

---

[86] See 8 Del. C. § 228(e).

[87] See Capano, 2014 WL 2964071, at *7 ("Inquiries into whether an unreasonable delay occurred or whether the defendant was prejudiced are inherently factual in nature and depend on a totality of the circumstances. Thus, motions to dismiss based upon laches are not routinely granted . . . ."); Dubroff v. Wren Hldgs., LLC, 2009 WL 1478697, at *6 n.45 (Del. Ch. May 22, 2009) ("[I]t is a difficult task to pursue successfully a laches defense in the context of a motion to dismiss.").

[88] After eliminating the time-barred challenges, Count II addresses transactions that took place in June 2016 through August 2018. For ease of reference, the remaining, actionable transactions (the "Actionable Transactions") are as follows:

- The June 2016 License Transaction;
- The June 2016 Equity Plan Amendment;
- The June 2016 Bridge Financing;

41

## 2. Count II as to Charter

As the basis for Count II against Charter, Plaintiff alleges that Charter was a controlling stockholder with concomitant fiduciary duties. Charter held a minority stake in Health Fidelity,[89] and a minority stockholder can be found to be a controller under Delaware law only where the stockholder "exercises control over the business affairs of the corporation" or has formed a "control group" with another stockholder.[90] In this case, Plaintiff does not allege that Charter, standing alone, exercised control over the business affairs of the corporation. Instead, Plaintiff argues that Charter formed a control group with Health Fidelity's majority stockholder, UPMC.

The Delaware Supreme Court addressed the requirements for pleading a control group in *Sheldon*, adopting the "legally significant connection" standard applied in multiple decisions of this court:

- The December 2016 Equity Plan Amendment;
- The August 2017 Voting Agreement Amendment;
- The 2017 Series B Financing;
- The August 2017 Certificate of Incorporation Amendment; and
- The December 2017 Equity Plan Amendment.

[89] By the beginning of 2016, UPMC owned over 70% of Health Fidelity's outstanding capital stock; by March 2019, UPMC owned 92.15% of Health Fidelity's outstanding capital stock. The Charter Funds, on the other hand, collectively held 26.79% of Health Fidelity's outstanding capital stock in 2014 and only 3.81% of Health Fidelity's outstanding capital stock by 2019.

[90] *Sheldon v. Pinto Tech. Ventures, L.P.*, 220 A.3d 245, 251 (Del. 2019).

42

> To demonstrate that a group of stockholders exercises control collectively, the [plaintiff] must establish that they are connected in some legally significant way—such as by contract, common ownership, agreement, or other arrangement—to work together toward a shared goal. . . . [T]here must be some indication of an actual agreement, although it need not be formal or written.[91]

In this case, Plaintiff does not identify any agreement or arrangement among Charter and UPMC to consummate the Actionable Transactions. Plaintiff alleges the existence of voting agreements and investors' rights agreements to which Charter and UPMC were parties, but those agreements do not require the parties to "work together toward a shared goal," they merely govern the relationship between them.[92]

Nor does Plaintiff allege facts sufficient to infer a control-group arrangement between Charter and UPMC. As two recent decisions of this court explain, it is often unreasonable to infer a legally significant connection to work toward a shared goal where, as here, one of the alleged group members has greater that 50% voting power.

---

[91] *Id.* at 251–52 (internal quotation marks omitted) (collecting cases interpreting *Dubroff* and adopting that standard).

[92] *See Silverberg*, 2019 WL 4566909, at *6–7 (rejecting control group theory where the legally significant relationship alleged did not "bear on the transaction[s] at issue in [the] case" (internal quotation marks omitted)); *see also van der Fluit v. Yates*, 2017 WL 5953514, at *6 (Del. Ch. Nov. 30, 2017) (dismissing a claim based on a control group theory where the alleged group members were signatories to an investors' rights agreement and noting that "Plaintiff offers no explanation for why [two investors] are members of an alleged control group while the numerous other signatories to these agreements are not").

In *Almond v. Glenhill Advisors, LLC*, the plaintiffs alleged that a number of minority stockholder defendants formed a control group with Glenhill, which owned 92.8% of the company's outstanding stock.[93] Chancellor Bouchard referred to this as a "glom on" theory, explaining that the plaintiff sought to "glom on to a preexisting controlling stockholder additional stockholders to give them the status of a control group."[94] In rejecting the theory, the Chancellor explained that, "[g]iven that the controller already is the proverbial 800-pound gorilla imbued with fiduciary obligations to guard against acting selfishly to the detriment of the corporation's minority stockholders, it is not readily apparent why this scenario would arise."[95]

Vice Chancellor Glasscock expressed a similar sentiment in *Gilbert v. Perlman*.[96] There, Francisco Partners held a 56% ownership stake in the company, but the plaintiff alleged that it was not the sole controller—instead, the plaintiff alleged that Francisco Partners formed a control group with two other defendants that owned approximately 11% and 0.02% of the company.[97] The court adopted the Chancellor's reasoning in *Glenhill* and rejected the control group theory because it

---

[93] 2018 WL 3954733, at *25 (Del. Ch. Aug. 17, 2018), *aff'd*, 224 A.3d 200 (Del. 2019) (TABLE)

[94] *Id.* at *26 (internal quotation marks omitted).

[95] *Id.* (internal quotation marks omitted).

[96] *See* 2020 WL 2062285, at *6–10 (Del. Ch. Apr. 29, 2020).

[97] *Id.* at *7.

was not reasonably conceivable that the pre-existing controller "need[ed] to include the minority holders to accomplish the goal, so that it has ceded some material attribute of its control to achieve their assistance."[98]

To overcome the unreasonable inferences underpinning Plaintiff's "glom on" theory, Plaintiff points to historical events concerning UPMC's initial investment in Health Fidelity. Recall that in 2014, Charter's Board designee, Schwarzer, offered to use his experience to negotiate a potential acquisition or third-party financing for Health Fidelity. Plaintiff alleges that Schwarzer preferred a third-party financing over a potential acquisition and preferred a low valuation, concealed these preferences from the Board, falsely informed the Board that the potential acquirers lost interest in a deal, and then struck a side-deal (the 2014 Series A Financing) with UPMC.

At most, however, Plaintiff's allegations concerning the 2014 Series A Financing show that Charter and UPMC agreed to work together to consummate that transaction. Not long after the 2014 Series A Financing, UPMC obtained a majority voting interest in Health Fidelity. Plaintiff gives no persuasive reason why UPMC would have needed Charter's agreement to consummate any transaction from that point forward.

---

[98] *See id.*

45

Plaintiff also argues that, because "UPMC had the right to unilaterally waive Charter's right of first refusal, . . . Charter had to appease UPMC if it wished to participate in the conflicted transaction."[99]  Although that may be true, it does not support Plaintiff's contention that Charter was part of a control group.  In fact, it suggests the opposite—Charter had to appease UPMC because UPMC had full control over the transactions.  Plaintiff alleges that there was some "*quid pro quo*" between the two,[100] but Plaintiff pleads no facts that would suggest UPMC "ceded some material attribute of its control to achieve [Charter's] assistance."[101]  Like the controllers in *Glenhill* and *Gilbert*, UPMC did not need Charter to effectuate the applicable transactions.

Accordingly, Plaintiff has not alleged facts sufficient to support his control-group theory, and Count II is dismissed as to Charter.[102]

---

[99] Pl.'s Answering Br. at 112 n.37.

[100] *Id.* at 112.

[101] *See Gilbert*, 2020 WL 2062285, at *7.

[102] The cases on which Plaintiff relies for a contrary proposition do not aid him.  Plaintiff presents his allegations as analogous to *Dubroff v. Wren Holdings*, *LLC*, 2011 WL 5137175 (Del. Ch. Oct. 28, 2011), and *Zimmerman v. Crothall*, 2012 WL 707238 (Del. Ch. Mar. 27, 2012), where the court rejected challenges to control-group theories.  *See* Pl.'s Answering Br. at 70–73.  But in both *Dubroff* and *Zimmerman*, unlike here, all of the members of the alleged control group held minority interests such that it was necessary to aggregate their respective influence in order to exert voting or actual control over the business and affairs of the corporation.

## III. CONCLUSION

The motion to dismiss Count I is GRANTED.  As to the time-barred claims and Charter, the motion to dismiss Count II is GRANTED.  The parties will have to stay tuned for the court's decision as to Count II concerning the remaining claims against the individual defendants and as to Counts III through VII.